First case on our docket today is John Gordon v. Tiger Illinois, et al., and we have Mr. Darryl Dunham, and we have Mr. Cockrell for the appellant, and you may begin when you are prepared to, Mr. Cockrell. Thank you. May it please the court, good morning. My name is Steve Cockrell, and I represent S. Cole Company and Charles Turner as both trustee and beneficiary of the Beverly J. Turner Replicable Trust. I also represent Tiger Industrial Transportation System. For purposes of this appeal before you today, I think there's some key, undisputed facts that the court needs to be aware of. All of these facts are undisputed. At some point prior to June 21st of 2001, John Gordon drafted two versions of a sales agreement whereby S. Cole Company would be sold along with the permit to allow mining and the leases that would allow mining at the Cambrian Mine. In exchange for that sale, Mr. Gordon would receive royalties at the rate of $2.50 per ton of coal sold and a fee for engineering services that he would provide of $.25 per ton. One version of that agreement was drafted so that the buyer would be Tiger, Illinois. The second version of that agreement was drafted so that the buyer was Beverly Turner. Tiger Industrial Transportation is also listed as a signatory on both of those agreements. Beverly Turner was the sole owner of Tiger Industrial, and Tiger Industrial was the sole owner of Tiger, Illinois. Beverly was married to Charles Turner. She has since passed away, and Mr. Turner is the trustee and beneficiary of her trust. All those facts are undisputed. It is also undisputed that on June 21st, Mr. Gordon, Tiger, Illinois, and Tiger Industrial signed one of those agreements that was found in the appendix at A-17. We refer to that agreement as the Tiger Agreement. Shortly after that, on July 2nd of 2001, Southern Illinois Power Cooperative, which we refer to as SIPC, which is the largest purchaser of coal in that area of the state, passed a draft purchase order for the coal at the Cambrian Mine to S. Coal Company, care of Mr. Gordon. And pursuant to that purchase order, SIPC agreed to buy the coal at the mine at the rate of $1.08 per million B2U. The next day, July 3rd of 2001, it's undisputed that SIPC signed that purchase order. John Gordon signed that purchase order as the president of S. Coal Company, despite signing the earlier agreement. On July 3rd, it's also undisputed that in Oklahoma, Beverly Turner and Tiger Industrial signed the other version of the sale agreement, which we refer to as the Turner Agreement. You find that in the appendix of A-50. A week later, on July 10th of 2001, Mr. Gordon signed the Turner Agreement. And the judge below just earlier found that that agreement was an ovation of the earlier agreement and that that was the agreement that was performed by the parties. Undisputed that Beverly Turner became the sole shareholder of S. Coal Company. It's also undisputed that John Gordon was an officer of S. Coal Company after the sale of S. Coal Company. All of those facts are undisputed. Let's turn, based upon those undisputed facts, to the claims that are being raised by the appellants in this action. The first one I'll group together is with respect to the sale of the timber rights above the mine. It's undisputed that Gordon sold and retained all of the proceeds from the sale of the timber at that mine. It's undisputed that the right to remove that timber was owned by S. Coal Company, pursuant to the leases that S. Coal Company had with the landowners. It's undisputed that Mr. Gordon kept a little over $12,000 of those sales proceeds, and that was the amount of the claim that was being asserted by the appellants. It's undisputed, but the testimony was that he was only transferring the right to remove the coal. That's the defense, yes, Your Honor. That is the sole defense, that he did not intend to transfer those timber rights. So it is disputed. Well, the facts that I set forth were not disputed. That's a defense. The facts are that S. Coal Company owned the timber rights. That's undisputed. That's pursuant to the leases. Mr. Gordon admitted that in his testimony at trial. What he's simply saying is when I signed the sale agreement, despite the clear language of the sale agreement, which you find in the agreement in the appendix A-50, where he sold S. Coal Company and all of the assets, it doesn't matter if he didn't think he was transferring the timber sale rights. He sold the company. All of the assets of the company go with the stock. The agreement actually mentions all of the assets. Okay, it doesn't mention timber. It says all of the assets. All assets. But what you're saying is that in testimony, Mr. Gordon admitted that all of the assets included the timber? No. He admitted that he sold all the assets, and he admitted that the timber rights were owned by S. Coal Company. So what's disputed is the interpretation of the agreement and whether it included timber. If you can interpret all assets for the stock in any way other than everything. Well, there clearly is a dispute about whether it's included, and that's part of why we're here, right? Clearly. You're just saying that the contract says he sold all the assets. And he sold the stock of the company, and it didn't have to say all the assets. If you sell the company, you get all the assets when you buy most of that stock. And so I don't think there's anything to interpret here. The agreement is clear and unambiguous on its face. That is an issue of law, not an issue of fact for this court. So there's no deference to the court's decision below. And so the trial court's decision on that is against the manifest way of the evidence and against the clear language of that sale agreement. Who drafted the agreement? Mr. Gordon drafted both versions of the agreement, undisputed. So that issue, I think, is relatively simple. You've got to decide the interpretation of the agreement. The second claim is a little more complicated. That's the claim that I refer to as a claim with respect to this disputed fee. In September of 2001, about three or four months after the sale took place, S-Coal Company was finally starting to get the coal out of the mine and started selling the coal to SIPC pursuant to that purchase order. Pursuant to the terms of the purchase order, the payments from SIPC for S-Coal went into a bank account that was controlled by Mr. Gordon. Mr. Gordon was to release the balance owed to S-Coal after withdrawing his royalty and his engineering fees. It is undisputed that in addition to taking the $2.50 per ton for the royalty and the $0.25 per ton for the engineering fees that he performed, Gordon also took an additional $1.77 per ton off of the top. And that is what we refer to as this disputed fee, the $0.08 per million BTU. The evidence established that $0.08 per million BTU is the same as $1.77 per ton. The turnovers claim that Gordon, pursuant to the sale agreement, sold S-Coal and all of the assets of S-Coal. That asset of S-Coal would include this purchase order with SIPC, which includes the full purchase price of $1.08 per million BTU. And that Gordon breached that agreement by retaining the $0.08 per million BTU. S-Coal, on the other hand, claims, just as it did pursuant to the timber rights claim, John Gordon, as an officer of that company, had fiduciary duties to the company, and he breached those fiduciary duties by both retaining the timber sales and by retaining this $0.08 per million BTU. Mr. Gordon offers up three defenses to that claim. The first defense is that the $0.08 per million BTU was not an asset of S-Coal, that the turnovers were willing to purchase this company at the sale price of $1 per million BTU, and therefore the $0.08 wasn't an asset. Again, on the face of the sale agreements drafted by Mr. Gordon, it says, I'm selling S-Coal and all of its assets. This purchase order is an asset. We didn't sell a portion of the purchase order. We didn't sell a portion of the assets. All the assets and all the stock that fits the agreement. The second defense raised by Mr. Gordon, a group together of several, saying that S-Coal ratified the agreement to pay him $0.08, that S-Coal waived his right to seek this claim by continuing to perform under the agreement, that S-Coal was just stopped from bringing this claim because they continued to perform under the agreement. All of those defenses are easily dealt with on two grounds. Number one, those defenses are affirmative defenses that were never pled by Mr. Gordon. And number two, and most importantly, those are all factual-based defenses, and the trial court did not find that those defenses apply. The trial court did not find that we had waived or ratified or stopped. It simply said that we had not proved up our claim. And that is very different from having an affirmative defense to that claim. The third defense, and one that we focused most on in our brief, is a claim that S-Coal agreed to Mr. Gordon's retention on this disputed fee when S-Coal signed this wire instruction sheet. You'll find the wire instruction sheet. It's a one-page document. It's in the appendix 856. First, if you look at that document, it's not an agreement. It's simply a wire instruction sheet. There's nothing that indicates that there's an agreement between the parties. Why did anybody need to sign it? There's a question with respect to why that was done. Well, they wouldn't have issued the money pursuant to this if everybody hadn't signed off on it. I assume that the bank would not have issued the money. Yes, sir. So in that respect, isn't it some kind of an agreement? I guess it's some sort of agreement that the bank can issue proceeds pursuant to this. In other words, everybody's agreeing that this is how the money is going to be divided. I don't know that you can say that because while it does say that the balance of the funds are going to be withheld, it doesn't say where those funds are going to go. Also importantly, Mr. Gordon is not a party to that document. Mr. Gordon signs the document as the president of MGM Trading. MGM Trading is not a party to this action. MGM Trading is not the one that kept the 8 cents. It's Mr. Gordon. Fourth, even if you find the wire instruction sheet is an agreement, there is no consideration to support that agreement, and that's what we focused on in the brief. In order for this agreement to be enforceable, there has to be consideration to support it. There is no evidence of any consideration supplied by MGM Trading to receive this 8 cents. There's no evidence at all about what they did. With respect to Mr. Gordon, there's nothing in the evidence that he did other than the duties he already had to perform pursuant to the Tiger and Turner agreements. Nothing new. And so if he's simply getting more for doing something already he's agreed to do, that doesn't supply the sufficient consideration. There is a question as to when this document was signed, and there is a dispute as to that. There's a kind of a paucity of evidence on our side because Beverly Turner has passed away and Charles Turner did not recall when it was received. But the undisputed evidence by Mr. Gordon is he knows it was signed after June 21, 2001. So he knows it was signed after the Turner agreement was signed. He also said that the bank signed it first, he signed it second, and then he sends it to the Turners in Oklahoma for signature. He does not know when it was ultimately signed. He believes, based on the testimony he says, he thinks it was shortly after June 21. But we know a couple other facts. At the top of this wine instruction sheet there is a reference to purchase order number 01-4013 with SIPC. The undisputed evidence is that purchase order was not drafted or sent to S-Pole until July 2, 2001. We also know that agreement wasn't signed, that purchase order wasn't signed by SIPC until July 3, 2001. We know as well that Mr. Gordon signed that purchase order with SIPC on July 3 as the president of S-Pole. Whereas this document, the wine instruction sheet, is signed by Beverly Turner as the president of S-Pole. We have evidence in the record that Mr. Gordon is signing documents and holding himself out as president of S-Pole Company to the Illinois Department of Natural Resources until at least July 16, 2001. And you'll find that in Exhibit S, pages 2 and 3. The earliest document that the evidence shows that Beverly Turner signed as president, President of S-Pole, was signed on July 17, the following day. You'll find that in Exhibit S, page 23. So I think the evidence certainly supports a finding that Beverly Turner did not sign this document as president of S-Pole until sometime after July 10, 2001. Now, the judge at the trial court level, Judge Speroni, found that the effective date of the Turner agreement wasn't until July 10, 2001, when Mr. Gordon signed that second agreement. Well, that's an issue of law. That's a question of law. The facts are clearly undisputed. Mr. Gordon didn't sign that document until July 10. But the Turner agreement on its face, again drafted by Mr. Gordon, says on the first paragraph that the agreement is as of June 21, 2001. Illinois law is also quite clear that this kind of sale contract did not have to be in writing to be enforceable. Mr. Gordon is the one that put the June 21 date on both agreements. He admits he drafted those agreements before June 21. He admits he only sold the company once. And when you look at the evidence of the law in Illinois with respect to donation, the Illinois courts have said that the new agreement is substituted for the original agreement. So in this case, the Turner agreement is substituted for the earlier Titor agreement. And we know that both of those agreements are identical. So as a matter of law, I do not believe that this court can find that there was any consideration supplied by Mr. Gordon or MGM Trading to support a finding that he was entitled to an additional $1.2 million with respect to this transaction. Where it's undisputed evidence that the first time that S. Cole would have ever known about this eighth sentence was pursuant to this wire instruction sheet. So that's the second grouping of claims. The third grouping of claims is with respect to the excess royalties and engineering fees retained by Mr. Gordon. Again, we have undisputed facts and evidence here. Pursuant to the Turner agreement, Mr. Gordon is to receive $2.50 per ton of coal sold for royalties and $0.25 per ton of coal sold for engineering fees. The undisputed evidence provided for the records of SIPC with respect to coal purposes, every two weeks there was a pay period. And the evidence was a 58-pay period. SIPC issued documents to the parties that indicate here's the amount of coal sold, here's the BTU of the coal, here's the amount of the coal paid. Mr. Gordon acknowledged that and no objections to that evidence. Also undisputed evidence, Mr. Gordon's own records of his payments to S. Cole based upon his records with respect to the tons of coal sold and the BTU. That was exhibit ZZ. Again, those prepared by Mr. Gordon, not objecting to. Unfortunately, with respect to those Gordon payment records that S. Cole had, S. Cole admittedly was missing the records from eight pay periods. Those records were either never received by S. Cole or they were possibly lost over the intervening years. Evidence undisputed about that. So S. Cole was not able to make a comparison of all 58 pay periods. We could only make a comparison for the 50 pay periods where we also had Mr. Gordon's records. Exhibit AAA supplied that comparison and there was an apples to apples comparison with respect to those 50 pay periods. That undisputed evidence, Mr. Gordon put in no counter evidence to this. Mr. Gordon could have, if he still hadn't brought in those eight missing pay sheets, those were never provided to the court. Undisputed that Mr. Gordon, pursuant to those 50 pay periods, retained $19,000 in royalties and almost $2,000 in engineering fees that, pursuant to the records issued by SIPC, he was not entitled to keep. Mr. Gordon's defense is simply that, hey, because we have the missing eight pay periods from my pay sheets, it's not competent evidence. Well, I submit to you it is competent evidence as to what happened in those 50 pay periods and there was no evidence to counter. No dispute with respect to the validity and credibility of the information for those 50 pay periods. And, therefore, the trial court's ruling against us with respect to these claims, against the breach of contract and breach of fiduciary duty, is against the only evidence on that point. The fourth claim is a claim brought in the alternative. If the court is inclined to believe that Mr. Gordon is entitled to retain this additional $1.2 million in funds for the disputed fee, which we do not believe you should, but should you do that, we claim that Mr. Gordon would have the obligation to pay the sales taxes with respect to those fees. The undisputed evidence was that those fees totaled almost $55,000. Mr. Gordon admitted in his deposition that he owed those sales taxes to S Pole Company. He changed his story at trial and said because the wire instruction sheet didn't say he had to pay the sales taxes on that $0.08 per million to you, he didn't have to pay it. And I submit to you, again, there's no consideration to support any such agreement in the wire instruction sheet. The wire instruction sheet is silent with respect to sales taxes, and equity demands that if he's going to get this $1.2 million, that he has to pay the sales taxes associated with that fee. Thank you. That concludes your time. Mr. Cockrell, you'll have opportunity to rebut. Mr. Dunham, you may proceed when you're prepared. Good morning. I'm Darrell Dunham. I represent John Gordon. I think the first point that the court needs to understand is that Mr. Cockrell wants to emphasize the first agreement, June 21st, with the attorney. What the court needs to understand is that Mr. Cockrell and the attorneys did not bring any lawsuit against my client on the June 21st agreement with the attorney. The way the suit proceeded is that Gordon filed first on the June 21st agreement for breach of contract, violation of that agreement. There wasn't any counterclaims filed. No lawsuits were filed. No effort brought by the attorney group to assert any claims against Gordon for breach of fiduciary duty or anything like that. What happened was is that S. Cole, which used to be owned by Gordon, now owned by the attorneys, brought a separate suit against Gordon. Initially, the decision was made. There was an effort to consolidate the cases. Initially, the decision was made by my client that was to resist consolidation, finally in the interest because it was going to be a financial struggle, finally in the interest of judicial economy, agreed to consolidate the cases. What the court needs to understand is that, and the judge found, and there's every reason to support Judge Ferroni's decision on this, is that with regard to all of the claims, I mean every claim, that the Turners have against Gordon, it's based on the agreement between Gordon and Beverly Turner where she acquired S. Cole. And that's July 10th. Not June 21st. July 10th because that's the date that Gordon signed the agreement. There was testimony in this case where I asked Charles Turner, and I asked him specifically in the records, when was the effective date of the agreement? When did you feel like you had a binding obligation against John Gordon? I showed him the date. He said July 10th, 2001. That's the date. Now, let's talk then about the 8 cents. I think there's plenty of evidence that would indicate that the Turners were aware of the 8 cents before July 10th, before July 1st. My client testified, and they didn't dispute that he thought he was interested in a deal with the Turners, with Tiger Industrial, with Tiger Coal, because they had a reputation of being able to do these kinds of deals and they were financially solvent. On July 21st, 2001, June 21st, 2001, what my client had essentially was S. Cole, and what S. Cole was is that there had been some monies expended in terms of developing the permit, but it just had proven reserves in the ground. And it certainly wasn't bankable at that point. And so he wanted the Turners, he wanted Tiger Industrial's name on that contract. It was important because they were the only really financially solvent entity in the entire transaction. But what developed was is that they couldn't get a bond. They weren't bonded. They couldn't get the permit. And they couldn't go forward with the deal because of alleged violations, which Mr. Turner was very vague at trial about what those were. But we know, we're using the word undisputed, it was undisputed that the Turners couldn't get a permit. So it was their idea that we have Beverly Turner acquire S. Cole because she could get a permit. Apparently Charles Turner himself couldn't get a permit. So under their theory, the only theory that they're advancing where they feel like they're entitled to money from my client is effective July 10th, 2001. And that finding by the trial judge cannot be against the manifestation of the evidence. Well, what we also know is undisputed is months before February, January, a man by the name of Vandal Lines, who was a Turner's representative, went with Gordon to SIPC and negotiated a cold purchase agreement. There was some haggling back and forth, and SIPC basically offered a dollar per BTU, million BTU. Discussion back and forth, Mr. Lines talked to Mr. Turner and said, okay, we can go for a dollar. They're willing to go forward for a dollar. So my client, and if you look at the economic realities, it assumes you can take $2.50 a ton and 25 cents engineering fee. It looks like that's a fairly substantial fee for him. But he has a mineral interest that he has to pay. He's got a broker's interest that he's got to pay. Once you divide up that $2.50 a ton, which the Turners really didn't care about, as long as they got their dollar, that's what they were interested in, and they got it. It left Gordon with very little in terms of this transaction. So he is able to negotiate an additional $0.08 for himself so that he essentially is going to get paid as a result of the transaction. Now, $0.08 BTU, given the amount of tons of coal over ship, that's a substantial amount of money. But you have to realize that Mr. Gordon said this was the deal of a lifetime. He's been in this business for 30 years, and this is the best prospect that he's ever had. He put $350,000 of his own money into it and balanced against his own investment, his own expertise. That's not an absorbent fee, but I don't think it makes any difference because as of July 10, 2001, let me make it July 9th, make it obvious. Who did Gordon owe fiduciary duties to at that point? You know, there was an argument made when they first brought their losses. They brought a charge against my client for fraud, misrepresentation, all kinds of things. That was the primary claim in their complaint, and it might confuse the court because a lot of that evidence went in that way. Well, they abandoned that argument on appeal because we're talking about very sophisticated businessmen, people that have been involved in these projects for a number of years. Any claim that these were naive, unsophisticated people that got taken advantage of, that's been abandoned on appeal. What about the sales tax? And you talk about naive, unsophisticated people. Didn't Mr. Gordon write a letter saying that he owed the sales tax? Yes, and I think, you know, be honest about that, Your Honor. When he got the benefit of counsel, we pointed out to him, look, there's $2.50 a ton that's been taken out of there. Their own man banned the lines, their own agent. He got $0.50 a ton out of this transaction as well. They're not going against their own agents for the sales tax. If you owe sales tax on the $0.08 and you owe sales tax and everybody else involved in the transaction owes sales tax on the $2.50 a ton, this is a broker's fee. It's our position it's a broker's fee. That's what we ordered before the trial court, and that's exactly what it is. And I've never been able to cite any case at all that would indicate that you have to pay a sales tax on a broker's fee. And that's our position, and I think that's the position that was embraced by Judge Peroni down below. On July 9, 2001, S. Cole had one caretaker. That was John Gordon. And so what they are arguing is that he owed fiduciary duties to himself, that he didn't have a right to negotiate any deal for himself because either he served in a corporate opportunity or he violated fiduciary duties. And that is just manifestly absurd. For this court or any court, we've looked. We can't find a case in Illinois to hold that in a closely held single shareholder corporation you can violate fiduciary duties to shareholders to yourself. There's no precedent that supports that position. And I think that's the position that they are urging on this court. So when Mr. Carper keeps going back to June 21, 2001, the agreement with Tiger and Tiger Industrial and my client was somehow a violation of all those agreements, that's not what he pled. That's not the lawsuit he brought. And he shouldn't be allowed to make those arguments in this court because, frankly, I think that's what he's trying to do. He's trying to confuse the court. So on July 10, 2001, they got whatever assets that S. Cole had. And at that point in time, the agreement had been made as to the $0.08, and that was Gordon's $0.08. Now, they can't argue fraud because they admit that they were prepared to go through with the deal if they got their dollar. And they got their dollar. They got everything that they were asking for in this transaction, and they went ahead with the agreement. Now, Mr. Carper does a mention that subsequently after they got out there and began mining, SIPC began to dock their coal. And they complained about that bitterly. Well, I can understand why because Mr. Blines, both in his deposition and in trial, admitted that he had been shipping dirty coal to SIPC. He didn't say dirty. He was in a shipping parlor, which is basically shale rock. Careful miners, when they're strip mining, they will deal with the parting and set it aside. Well, if you're going to ship parting, then you're shipping dirty coal, and you're not going to meet the BTU limits. And they complained. They complained to Gordon. They complained bitterly about this. And so what did Gordon do? Gordon goes to SIPC. He negotiates a new deal entirely. Gordon testified he was fortunate for the parties that there had been a break in the market, and SIPC really needed this coal. And so he was able to get the BTU limits changed. There's undisputed that this change, this modification in the SIPC shipping order, inured to the Turner's benefit, inured to S. Coal's benefit, an excess of $1 million. In other words, as a result of Gordon's efforts, they got an extra million dollars out of this. But when did that, when was this new agreement made? It was negotiated, Your Honor, I believe it was in early August. That's my recollection. 2001. In 2001. After they initially began shipping, and SIPC began docking their dirty coal. So Gordon does what, he goes out there, he gets a new deal for them. They get an extra million. And at that point in time, there's no dispute at all that they're complaining about the $0.08. Oh, you didn't have the right to do the $0.08. Gordon's saying, but you knew about the $0.08. No, he didn't. Yes, he did. There's that dispute that's in the evidence. And we think it's been resolved against them. But I don't think it makes any difference. Because at that point in time, and all of this evidence about Gordon going there, negotiating the deal, them going ahead and performing under the contract anyway. They say we had a duty to plead and plead that. But it all came in, was an objective to, it's in the record, if necessary, even at this point, we can move to conform to proof. But I don't even think that's necessary. So, I asked the question, Mr. Turner. I asked the question, Mr. Belines. I said, well, you felt like you were compelled to go forward, notwithstanding the $0.08. And you felt like you had been cheated. I said, well, why didn't you bring suit? Is there anything in the contract, is there any reason why you couldn't have brought suit in July, of 2001, complaining about the $0.08? No. They never answered the question. So here they are, wanting Gordon to go get them an extra million dollars, which he does. Gets them the extra million. They're in there and notice that the $0.08 is being withdrawn each and every month. And they feel like they've been defrauded, that there's been breach of fiduciary duties. Well, where? How? Under what circumstances? It just doesn't exist. I don't see it. There's no written contract that talks about $1.08? There is a written contract with SIPC. Right. There's no written contract anywhere that says that my client is not entitled to his $0.08 BTU broker's fee. Nowhere. Is there an agreement that calls it a broker's fee for the $0.08? I don't think there is anywhere in the SIPC contract that it's expressly called a broker's fee. But for them to claim that they didn't understand that's what it was, just to belies reality, their own man banned the lines. Not from earners. Banned the lines, it's getting a $0.50. But bringing parties together, broker's fee, out of Gordon's $2.50. How would anybody know who to pay the $0.08 to? Well, because that's exhibit A56. It's in the SIPC contract. And as you all pointed out, before the bank's going to do anything, they're going to want to know. They're the escrow. They're going to want to know who's getting the money. And there it is, A56, signed by Beverly Turner. And what is the complaint? Well, she didn't read it. She didn't know what she was signing. They complained, well, it's MGM Trading, John Gordon present. That's just a brokerage account for John Gordon. She signed this document. And the best credible evidence is, you look at when they went into possession and when they started shipping, had to be well before July 10th in order for the transaction to be consummated and the deal to go forward. So for them to argue they didn't know about it, it was just an effort by them to extort more money out of John Gordon. And at least in the trial court, it failed. Now, I'd like to talk about the novation. If the law were that any time you got the same parties or a similar party signing the same contract with involving identical subject matter, that's a novation. Then we've got a real problem because people go into banks all the time and sign renewal notes. Note is expired, your year is up, they go in and sign a renewal note. They'll do it several times. The law is well established in Illinois and in other states that the bank, as long as the statute of limitations hasn't expired, can sue on any one of those notes. Now, even a bank can get into trouble if it does something like this and marks canceled, paid, paid by renewal or something like that and gives the note back. That's clear evidence and Illinois courts have recognized that while the bank is intending to rely on the new notion. Now, what evidence do we have that this was John Gordon's intent? Because there isn't any dispute because it's got to be the intent not only of Turner's, but it's also got to be the intent of John Gordon that the second contract with S. Cole be the one that's fined. That's important to my client, of course, because he's got a contract with the Turners, Tiger Industrial, indicating where Tiger Industrial has agreed to go in there and mine all of these reserves to depletion. And at first they tried to argue they didn't know what that meant, but apparently on appeal they have abandoned that argument and there's no dispute that it wasn't mined to depletion. Both the number 5 scene and the number 6 scene were not mined to depletion. The SIPC contract contemplates that there would be 1.5 million tons of coal shipped and less than 700,000 were mined. Approximately at least 800,000 tons of coal are still in the ground. They put the overboarding over it. Now, from an economic standpoint, it's impossible for my client or anybody else to ever get those reserves. And I think it was, unfortunately, it was a waste because not only was Gordon injured by this, but all of the world interest owners were injured by this and the people in South Carolina employed. Gordon testified throughout, one of the reasons that he wanted to do this deal and do it to depletion is because he was helping the local economy and Williamson County has lived there for years. Didn't happen. Well, why would Gordon? He testified about this, agreed to let Tiger Industrial, Tiger International, off the hook, if you will. There's no reason for him to have done that. Everybody agrees that Tiger Industrial was the only solid enemy at the beginning of the transaction. There would have been nothing in it for him to agree. One way to allow only Beverly Turner and S. Cole to be responsible under this contract. No, made no economic sense whatsoever. There's nothing in any of the agreements that indicates that it's a novation, that it was being superseded. There's no testimony that Gordon ever agreed to that. In fact, there was no testimony that Turner's, either Van der Lines or Turner's, ever indicated that that was what the purpose of the deal was. The only reason, the only reason was they couldn't get it from him. Thank you. Thank you, Mr. Dunham. Mr. Cockerell, do you have rebuttal? I do, thank you. May it please the Court. Mr. May. Let me go through a few things that Mr. Dunham raised. We've never sued under the June 21st Tiger agreement. There's been no confusion. That's part of the evidence that went to the explanation of how it was developed. With respect to the novation, we had to provide proof of that earlier agreement. And the law in Illinois is quite clear, and I've cited this in our briefs, but when a contract is rescinded by novation, the contract in existence prior to the novation loses its individuality and becomes merged in the new contract. The second agreement takes the place of the first agreement. The second agreement is substituted for the earlier contract and becomes the only agreement of parties on the subject. That's why we have talked about the Tiger agreement. We have always sued under the Tiger agreement. The obligations are exactly the same because the language is identical. With respect to the knowledge of the $0.08 per million BTU, Mr. Dunham got up here and talked a lot about facts that simply are not supported by the record. He didn't cite you to the record. Mr. Gordon admitted that the first time that Escol and the Turner's would have known about the $0.08 per million BTU was when they got that wires construction agreement. You will find that at page 463 of the transcript, and it's cited in our brief. Mr. Dunham wants to talk about Judge Speroni's finding that July 10, 2001, is the date when the Turner agreement became effective. Again, I submit to you that's a legal question, but let's assume that it is July 10, 2001. He says at that point, all of the assets are transferred because of the agreement. Yet he didn't talk to you about that 10 months. And if you look at the SIPC contract, again, he cites you to the wrong page. In the appendix, A28, all funds by SIPC are to be paid directly to Escol Company. That's in the SIPC contract. The asset of Escol Company is that purchase order, and all $1.08 gets paid to Escol Company. Not $1.00. There's no mention of $0.08 anywhere in that agreement. It's $1.08. There's no mention of anything getting paid directly to John Gordon. It gets paid to Escol through, and to be fair, this agreement does say it's going to be pursuant to a wire transfer to that bank, and we have the wire instruction sheet. This is a common thing that so-called co-brokers do, though, isn't it? I mean, you go to a purchaser, they say, we'll buy co-friendly for $1.08, and if you find a supplier of co- for $1.00, you've got $0.08 that you make in between. If you make that the agreement, certainly, but there is no certain. What Mr. Gordon did, and we went through all the representations pre-June 21, and it's in the brief, but all the way pre-June 21, all he wants is $2.50 a ton, all he wants is $0.25 per engineering fee. That's all he wants throughout the negotiations. That never changed. And then what he does, while he's still negotiating with us, he signs a deal with another company, and this Michael Moore, and agrees to pay Michael Moore a commission if Michael Moore can secure a purchase order with SIPC, but this deal with Michael Moore, better known to us behind the scenes, only becomes effective if the company which Michael Moore has a part in to default on their agreement with Mr. Gordon. It's an ugly transaction, but it's not really pertinent. But, yeah, he did go out after the fact when there was a thought that we would take it for $1 per million BTU, and SIPC said, we'll buy it for $1 per million BTU. We said, we'll sell it to you for $1 per million BTU back in February, but there was no purchase order, and that deal didn't get happened. We buy the company, and in the agreement, in the sale agreement, Mr. Gordon is obligated to get a sales agreement for the benefit of S. Cole, not for his benefit. The sale agreement talks about the $2.50. The sale agreement talks about the $0.25. It nowhere mentions the $0.08 because he's trying to steal it from us, and that's what he ended up doing. I certainly agree, he could charge $4.27 per ton of coal for a royalty or broker's fee, but that's not what he did. He signed this agreement, signed the deal with SIPC, and then buries it in a wire instruction sheet that he sends, and from that, S. Cole Company, and they should have read it, no question about it, and they're bound by it even if they didn't read it, but they're not bound by it, there's no consideration, and the evidence, even if you buy that it had to be signed after July 10th, the evidence supports that. Thank you very much for your attention. Thank you. Thank you for your arguments, gentlemen. We'll take the matter under advisement or under a ruling in due course.